STATE OF CONNECTICUT *v.* MICHAEL J.
(SC 17229)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

not serve as a bar to the consideration of the plaintiff's claims in the present appeal.

Argued January 13—officially released July 5, 2005

*Elizabeth M. Inkster*, senior assistant public defender, with whom were *Mary Miller Haselkamp*, senior assistant public defender, and, on the brief, *E. Paul Haringa*, former assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Maxine Wilensky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Michael J.,[1] appeals[2] from the trial court's denial of his motion to dismiss the criminal charges pending against him in connection with his alleged sexual abuse of C, his eleven year old daughter. The trial on those charges ended in a mistrial after C testified, on direct examination by the state, about certain incidents of the defendant's uncharged misconduct that were not specified in the bill of particulars or the amended information. The defendant thereafter moved to dismiss the charges, claiming that the mistrial was caused by egregious prosecutorial misconduct and, therefore, that a retrial on those charges would violate his right to be free from double jeopardy, as guaranteed by the United States constitution and the constitution of Connecticut. On appeal from the trial court's denial of that motion, the defendant claims that the court: (1) improperly denied his request for an evidentiary hearing that would have allowed him to develop a factual record of prosecutorial misconduct in support of his motion to dismiss; (2) erroneously found that the assistant state's attorney (prosecutor) did not intend to provoke him into moving for a mistrial when she elicited inadmissible testimony from C and, on the basis of that finding, improperly concluded that a retrial on the charges would not violate his double jeopardy rights under the United States constitution;

---

[1] In accordance with General Statutes § 54-86e and our policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the complainant or others through whom her identity may be ascertained.

[2] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

and (3) improperly rejected his claim that the prohibition against double jeopardy that is implied in the Connecticut constitution provides him with broader protection than that afforded by the United States constitution. We affirm the trial court's denial of the defendant's motion to dismiss.

The record reveals the following facts and procedural history. The defendant was arrested on August 22, 2000, pursuant to a warrant issued in connection with C's allegations that the defendant had sexually abused her in November and December of 1998. After the state charged the defendant with sexual assault, risk of injury to a child and other crimes, he requested a bill of particulars, and, in response to that request, the state filed an amended long form information on January 9, 2003, that contained four counts. The first count alleged that the defendant had committed sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (B), when, "on or about [November 27], 1998, in the area of Fountain Street, [New Haven] the [defendant] compelled his then eleven year old daughter to submit to sexual contact (by placing her hand on his penis and masturbating him) by threatening to hit her, which reasonably caused her to fear physical injury . . . ." In count two, the state alleged that, "on or about [November 27], 1998, in the area of Fountain Street, the [defendant] subjected his then eleven year old daughter to have contact with his intimate parts, in a sexual and indecent manner likely to impair her health or morals . . . in violation of [General Statutes (Rev. to 1997) §] 53-21 (2)[3] . . . ." Count three charged the defendant with sexual assault in the first degree in violation of General Statutes (Rev. to 1997) § 53a-70 (a) (2), alleging that, "on diverse dates between November, 1998, and December, 1998, in the area of Whalley Avenue, [New Haven] the [defendant] engaged in sexual

---

[3] Hereinafter, all references to § 53-21 (2) are to the 1997 revision.

intercourse (cunnilingus) with his then eleven year old daughter . . . ." Finally, the state alleged in count four that the defendant, "on diverse dates between November, 1998, and December, 1998, in the area of Whalley Avenue . . . had contact (by means of cunnilingus) with the intimate parts of his then eleven year old daughter, in a sexual and indecent manner likely to impair her health or morals . . . in violation of [§] 53-21 (2) . . . ."

The defendant thereafter filed a motion in limine, requesting that the court preclude the state from introducing evidence of any prior acts of misconduct by the defendant that were not specified in the bill of particulars.[4] The court granted that motion on the same day that the defendant's trial commenced. In its ruling, the court explained that "the state is restricted to the allegations in the operative information which consists of . . . four counts and is dated January 9, 2003." The court further observed that the allegations make clear that the charges against the defendant culminated from two incidents, specifically, the alleged incident involving masturbation that took place on Fountain Street and the alleged incident involving cunnilingus that occurred subsequently on Whalley Avenue.

The jury thereafter was sworn, and the state called C as its first witness. C first testified that, at the time of the alleged abuse, she was living with her paternal grandmother but had visited the defendant during weekends at his apartment on Fountain Street. She stated that, in late November, 1998, during one of these visits, the defendant called her into a bedroom of his apartment and offered her $10 if she would "masturbate

[4] The bill of particulars specified the same incidents of misconduct that the state incorporated in its amended information, namely, the alleged incident involving masturbation in the area of Fountain Street and the alleged incident involving cunnilingus in the area of Whalley Avenue. See Practice Book § 41-22.

him." C explained to the jury that she complied with the defendant's request because other people had told her that the defendant had beaten her and her brothers when they were younger, and, therefore, she feared him.

C then proceeded to describe the sexual abuse that allegedly had occurred thereafter on Whalley Avenue. She testified that the defendant had picked her up at her grandmother's house to take her shopping and to see a physician. She stated that, after they had done some shopping, the defendant took her to a motel on Whalley Avenue where he ordered her to take off her clothes and lie on the bed. The prosecutor then inquired of C whether the defendant had said anything to her. C responded that the defendant had "told [her] to masturbate him like [she] did the first time." The prosecutor asked additional, follow-up questions regarding the masturbation incident that occurred at the motel, which C answered. C then testified that the defendant had told her to open her legs and, when she did so, he put his tongue in her vagina and moved it in a "side to side" motion. After she described that act of cunnilingus, the prosecutor asked C what had happened next. C responded that the defendant had laid on top of her. A colloquy then ensued between the prosecutor and C in which it was revealed that the defendant allegedly had committed other acts of sexual abuse against C while they were at the motel. Specifically, in response to questions asked by the prosecutor, C recounted that the defendant had rubbed his penis against her while she was lying on the bed facing him and then had turned her over on her stomach, laid on her back and continued to massage her with his penis. C also testified that the defendant had her kneel down while he rubbed his penis against her buttocks.

The court thereafter adjourned for the luncheon recess. During that recess, the defendant filed a motion for a mistrial, claiming that the state had failed to pro-

vide him with certain exculpatory evidence. In support of that motion, the defendant alleged that: "1. [C] ha[d] testified on direct [examination by the state] to a number of things that were inconsistent, either directly or by omission, with her statement[s] to the constancy witnesses . . . [and to] the police . . . . 2. The [prosecutor's] questions were phrased to elicit this particular information . . . . 3. None of this information had been disclosed to the defendant . . . [and] 4. The failure to disclose this information violate[d] the defendant's right to a fair trial and his right to cross-exam[ine] the witness . . . ." Upon receipt of the defendant's motion, the court excused the jury for the remainder of the day.

The following day, the trial court conducted a hearing on the defendant's motion. At that hearing, defense counsel contended that C's testimony regarding the alleged sexual acts at the motel other than the cunnilingus incident, and the defendant's purported history of beating C and her brothers, concerned prior acts of uncharged misconduct. Defense counsel further contended that the prosecutor elicited C's testimony in contravention of the court's earlier ruling on the defendant's motion in limine. The prosecutor responded that she had no prior knowledge of the additional sexual allegations to which C had testified, other than that the defendant allegedly had "flipped [C] over on her stomach and laid on her back," an act that the prosecutor viewed as an integral part of the cunnilingus incident.[5] The prosecutor likewise stated that it was "news

---

[5] During oral argument on the motion for a mistrial, defense counsel cited other excerpts from C's testimony that, according to defense counsel, were inconsistent with C's prior statements and, therefore, were exculpatory. Among these excerpts were C's testimony that: (1) the defendant had instructed her on how to masturbate him and had ejaculated on her hand during the first incident that occurred on Fountain Street; and (2) C and the defendant had visited various shopping establishments prior to and after the rental of the motel room in a sequence that differed from C's earlier version of the events. Although the prosecutor did not state whether she

to [her]" that C believed that the defendant had beaten her and her brothers when they were younger.[6]

The court granted the defendant's motion for a mistrial, concluding that C had testified about incidents of sexual abuse that were not alleged in the information. The court reasoned that such testimony was prejudicial to the defendant and that its prejudicial impact could not be alleviated through a curative instruction. In its ruling, however, the court stated that "[there is] nothing . . . to suggest that the state knew [that C] would . . . testify as to these additional acts of misconduct. Also, there was no objection to such evidence once it came in."

The defendant subsequently filed a motion to dismiss the charges against him, claiming, inter alia, that, by virtue of the state's "deliberate and wilful failure to apprise [him] of prior misconduct evidence, failure to comply with the [trial court's ruling on the defendant's motion in limine] and failure to disclose exculpatory information, the state intentionally put the defendant in a position in which he had no option but to move for a mistrial . . . ." The defendant therefore contended that a retrial on the charges pending against

knew about these inconsistencies before trial, she contended that they were "fodder for cross-examination [and] not exculpatory in nature."

The record also reveals that, prior to trial, the defendant had received excerpts from a report prepared by the department of children and families that stated that C had accused the defendant of engaging in other acts of misconduct against her, including one incident of penetration, and that the victim's mother had planned to report these additional incidents to the prosecutor. There is no indication in the record, however, that the incidents referenced in the report involved the same acts of uncharged misconduct that were the subject of C's inadmissible testimony at trial.

[6] Although the prosecutor disavowed knowledge of the defendant's alleged beatings of C and her brothers, she informed the court that C had told her that she was afraid of her father because he was violent. The prosecutor explained that, in her view, C's testimony concerning the beatings was admissible because it was relevant to C's state of mind when the charged incidents occurred.

him would violate the double jeopardy clause of the fifth amendment to the United States constitution, which is made applicable to the states through the due process clause of the fourteenth amendment,[7] and the prohibition against double jeopardy that is implied in the due process clause of the constitution of Connecticut. On that same day, the defendant also filed a motion for an evidentiary hearing in order to develop a record in support of his motion to dismiss.

Oral arguments with respect to the latter motion were held on April 9, 2003, during which defense counsel claimed that an evidentiary hearing was necessary in order to determine whether the alleged prosecutorial misconduct was sufficiently egregious to bar a retrial on the pending charges. In particular, defense counsel sought to determine: (1) whether, prior to trial, the state had acquired information regarding the additions and changes to C's allegations that emerged from her testimony; (2) when the state had acquired that information, if any; and (3) what the state had done with any such information upon receipt thereof. Defense counsel contended that this information could not be gleaned from the record, and, consequently, that the defendant was entitled to an evidentiary hearing pursuant to *State* v. *Colton*, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). The court denied the defendant's motion for an evidentiary hearing, noting initially that the standard upon which it would rely in evaluating the defendant's motion to dismiss was set forth in *State* v. *Butler*, 262 Conn. 167, 175, 810 A.2d 791 (2002) (applying standard announced in *Oregon* v. *Kennedy*, 456 U.S. 667, 679, 102 S. Ct. 2083, 72 L. Ed. 2d 416 [1982]). The court stated that *Butler* makes clear that "the question to be asked is whether the prosecutor intended to provoke a mistrial . . . ."

---

[7] *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

Drawing on its earlier finding that the prosecutor did not know that C would testify concerning the uncharged acts of sexual misconduct, the court explained: "[T]here is . . . no reason to have an evidentiary hearing because the court bases its decision on [its] having heard the proceedings, having observed the witness . . . the prosecutor and defense counsel, and the court is firmly convinced that there was never any intent on the part of the state to provoke a mistrial."

On June 16, 2003, the defendant filed a motion for reconsideration of the court's April 9, 2003 denial of his motion for an evidentiary hearing. During oral argument on that motion, defense counsel requested that the court rule on a companion motion, also filed on June 16, 2003, to make the affidavit of the defendant's trial counsel, Mary Haselkamp, part of the factual record on which the court would rely in subsequently ruling on the defendant's motion to dismiss. In that affidavit, Haselkamp alleged that the prosecutor had made out-of-court statements to her that supposedly were relevant to a determination of the prosecutor's intent. Most notably, Haselkamp attested that, prior to trial, the prosecutor had told her that the case could not be resolved short of trial on the basis of discussions with C's family and, furthermore, that the prosecutor "believed that the [defendant] would win the trial . . . ." Haselkamp also averred that, immediately after C had testified at trial, the prosecutor told her that "she knew about some of the testimony, but not all of it." The trial court denied both June 16, 2003 motions and, with respect to the motion concerning the affidavit, declined to make "findings of fact in accordance with the affidavit that counsel ha[d] submitted." The court, however, did place the affidavit in the court file to preserve it for appellate review.

On July 2, 2003, the court denied the defendant's motion to dismiss the charges pending against him.

During the hearing on that motion, defense counsel contended that a retrial not only would violate the double jeopardy clause of the United States constitution, but also the more liberal "double jeopardy rule [implied] in article first, [§ 8], of the Connecticut constitution." With respect to the latter argument, defense counsel acknowledged that the issue of whether the double jeopardy guarantee inherent in the Connecticut constitution affords a defendant broader protection against retrial after the declaration of a mistrial on the basis of prosecutorial misconduct than that embodied in the federal constitution is one of first impression. Defense counsel nevertheless urged the court to adopt a more protective state constitutional standard that would bar a defendant's retrial whenever the prosecutor has "deliberately engaged in misconduct [that] prejudice[s] the defendant to the point of denying him a fair trial." The court declined that invitation, holding that the standard announced in *Oregon* v. *Kennedy*, supra, 456 U.S. 679, governed its inquiry under both the federal and state constitutions. Because the court previously had found, pursuant to that standard, that the prosecutor did not act with the intent to provoke a mistrial, the court denied the defendant's motion to dismiss. This appeal followed.

I

The defendant's first claim, which concerns the trial court's denial of his motion for an evidentiary hearing, has two parts. He first argues that the trial court abused its discretion in basing its finding of prosecutorial intent solely on its observations of the proceedings. The defendant contends that an evidentiary hearing was required in order to allow him to establish a connection between the prosecutor's off-the-record conduct and her motivation and intent when she elicited inadmissible testimony from C. Second, the defendant claims that the court's denial of his motion for an evidentiary hearing rendered

him unable to carry his burden of proof with respect to his double jeopardy claims and, therefore, that the court violated his constitutional right to procedural due process.

The state counters that "[t]he record before the trial court, which included the discussion relating to the defendant's motion in limine, [C's] direct examination, the discussion relating to the motion for a mistrial, and numerous representations of both counsel, provided an adequate basis for the court to determine whether the prosecutor [had] acted intentionally to provoke a mistrial." The state therefore maintains that the trial court did not abuse its discretion or violate the defendant's constitutional rights in failing to undertake an evidentiary hearing. We agree with the state.

We first set forth the standard that governs our review of the defendant's claim. "We consistently have held that, unless otherwise required by statute, a rule of practice or a rule of evidence, whether to conduct an evidentiary hearing generally is a matter that rests within the sound discretion of the trial court." *State v. Nguyen*, 253 Conn. 639, 653, 756 A.2d 833 (2000) (reviewing trial court's denial of evidentiary hearing prior to determining whether witness sequestration order had been violated under abuse of discretion standard); see also *State v. George B.*, 258 Conn. 779, 786–87, 785 A.2d 573 (2001) (decision to grant evidentiary hearing in order to determine defendant's competence requires "exercise of sound judicial discretion" [internal quotation marks omitted]); *State v. Johnson*, 253 Conn. 1, 52, 751 A.2d 298 (2000) (concluding that "court acted within the legitimate bounds of its discretion in not undertaking an evidentiary hearing regarding the defendant's motion to withdraw his plea"); *State v. Jennings*, 5 Conn. App. 500, 505, 500 A.2d 571 (1985) ("[w]hether to hold an evidentiary hearing on a motion for mistrial is within [the trial court's] broad discretion"). "On appeal,

every reasonable presumption in favor of the trial court's discretionary ruling will be made." (Internal quotation marks omitted.) *State* v. *Nguyen*, supra, 654. In determining whether the trial court has abused its discretion in failing to conduct an evidentiary hearing in the face of allegations of misconduct, we have found instructive those cases dealing with the proper scope of the trial court's inquiry in similar contexts. See id., 653–54.

"In the past, we have recognized that the trial court has broad discretion to determine the form and scope of the proper response to allegations of . . . misconduct. See *State* v. *Ross*, [230 Conn. 183, 228, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995)]; *State* v. *Rodriguez*, [210 Conn. 315, 326, 554 A.2d 1080 (1989)]; *State* v. *Asherman*, [193 Conn. 695, 735, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]. *State* v. *Brown*, [235 Conn. 502, 523–24, 668 A.2d 1288 (1995)]. In *Brown*, for example, we exercised our supervisory authority over the administration of justice to hold that . . . a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. . . . We [emphasized however] that the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct . . . . Our role as an appellate court is limited . . . to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion." (Internal quotation marks omitted.) *State* v. *Nguyen*, supra, 253 Conn. 654–55.

In *Nguyen*, we applied the principles of *Brown* to conclude that the trial court had not abused its discretion in failing to conduct an evidentiary hearing prior

to its determination that defense counsel had engaged in discussions with witnesses that violated the terms of a sequestration order. Id., 660. In reaching that conclusion, we again emphasized that the court has broad discretion to fashion its inquiry into alleged misconduct; id., 653–55; and noted that the form and scope of that inquiry will necessarily vary with each case. See id., 656. We concluded that, under the circumstances of that case, "defense counsel's representations [to the court] provided adequate factual support for the trial court's determination that the discussion at issue undermined the purpose of the sequestration order"; id., 659; and, therefore, that the trial court did not abuse its discretion in failing to conduct an evidentiary hearing. Id., 660.

In the present case, we first must determine whether the trial court abused its discretion in relying solely upon its observations of the proceedings as factual support for its finding that the prosecutor had not intended to provoke a mistrial when she elicited evidence of the defendant's uncharged misconduct during her direct examination of C. We conclude that it did not.

The court had a superior opportunity to observe those proceedings, including: (1) the manner in which the prosecutor posed questions to C concerning the sexual abuse allegedly perpetrated on her by the defendant; (2) C's demeanor and emotional state as she was responding to those sensitive inquiries; (3) whether it appeared that the prosecutor merely was seeking to unearth additional information from C concerning the two charged incidents of misconduct or, instead, was purposely trying to elicit inadmissible testimony; and (4) all other aspects of the proceedings that were relevant to its determination of the prosecutor's intent. We further note that the conclusions that the court drew from its observations of the proceedings were formed within the context of its broader knowledge of the case,

including its observations of the prosecutor's conduct during arguments on the defendant's motion in limine and other pretrial proceedings. On the basis of its observations alone, the court was "firmly convinced" that the prosecutor had not intended to provoke a mistrial when she elicited inadmissible testimony from C, and we have no basis for questioning the court's certainty in that regard. See, e.g., *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 487, 678 A.2d 469 (1996) (trial court has "unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us" [internal quotation marks omitted]); *State* v. *Brown*, supra, 235 Conn. 527–28 ("the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of . . . misconduct, [regardless of] their source" [citations omitted]).

The conclusion that the trial court had drawn from its observations of the proceedings also was reinforced by the prosecutor's representation to the court that she had no prior knowledge of the uncharged incidents and, therefore, could not have foreseen that C would testify about them at trial. As we previously have noted, "[a]ttorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 420, 680 A.2d 147 (1996). Thus, the trial court was entitled to credit the prosecutor's assertions and could have relied on them in support of its finding that she did not intend to provoke a mistrial.

We further note that, prior to the trial court's denial of the defendant's motion for an evidentiary hearing on April 9, 2003, the defendant did not provide the court

with any basis for calling into question its earlier finding that the prosecutor had not intended to provoke a mistrial. The motion to dismiss simply alleged that the prosecutor had failed to turn over exculpatory evidence and had violated the court's ruling on the defendant's motion in limine. At oral argument on the motion for an evidentiary hearing, which also occurred on April 9, 2003, defense counsel represented to the court that she was seeking a hearing essentially for discovery purposes, or as she put it, to determine "whether or not the [prosecutorial] conduct in this case is such that it would bar reprosecution . . . ." At no time during that argument did defense counsel make an offer of proof that would have led the court to believe that an evidentiary hearing would yield evidence tending to show that the prosecutor had intended to provoke a mistrial when she elicited inadmissible testimony from C.

Haselkamp's affidavit did not surface until June 16, 2003, when the defendant filed a motion for reconsideration of the court's denial of his motion for an evidentiary hearing. In his motion for reconsideration, the defendant relied on the same generalized assertions that defense counsel had advanced during oral argument on April 9, 2003. Although the affidavit was not proffered in support of the defendant's motion for reconsideration but, rather, was the subject of a separate motion to make the affidavit part of the factual record for the defendant's motion to dismiss, both motions were before the court simultaneously and concerned evidentiary matters pertaining to the motion to dismiss. Despite the belated introduction of the affidavit and the great deference we afford to the vantage of the trial judge, we believe that the court should have considered the contents of Haselkamp's affidavit prior to its denial of the defendant's motion for reconsideration. We conclude, nonetheless, that its failure to do so was harmless because the affidavit contained no information that con-

tradicted the court's earlier finding or necessitated further inquiry into the prosecutor's intent by way of an evidentiary hearing. The most significant allegations made in the affidavit, namely, that the prosecutor told Haselkamp that "she believed that the [defendant] would win the trial," and that "she knew about some of [C's inadmissible] testimony, but not all of it," do not support an inference that the prosecutor had intended to provoke a mistrial or had engaged in misconduct outside the confines of the courtroom. Nor does the latter statement contradict the prosecutor's representation to the court that she knew that the defendant had "flipped [C] over on her stomach and laid on her back," but thought that that act was an integral part of the cunnilingus incident. In short, the affidavit simply did not provide a sufficient basis to initiate a more probing inquiry into the prosecutor's intent.

We also recognize that the court reasonably could have concluded that a full evidentiary hearing into the prosecutor's off-the-record conduct would do no more than "impugn [her] veracity . . . and impose a staggering burden of time and effort on our already overburdened court system." (Internal quotation marks omitted.) *State* v. *Nguyen*, supra, 253 Conn. 658. Indeed, in light of the prosecutor's adamant assertion that she did not know that C would testify to incidents of the defendant's uncharged misconduct, an evidentiary hearing likely would not have yielded much valuable evidence.[8] The defendant nonetheless contends that the court was bound to afford him an evidentiary hearing pursuant to *State* v. *Colton*, supra, 234 Conn. 683, and

---

[8] We do not mean to suggest that the burden imposed on the judiciary from conducting an evidentiary hearing is a sufficient reason alone to deny such a hearing. Rather, we merely observe that it is one factor that the trial court reasonably could have considered in this case in view of the fact that it was unlikely that an evidentiary hearing would have provided a basis for determining the prosecutor's intent that was any more reliable than the court's own objective observation of the proceedings.

that its failure to do so not only constituted an abuse of its discretion, but also offended his constitutional right to procedural due process. We are not persuaded.

In *Colton*, the defendant, Murray Colton, had been tried three times for murder. Id., 684. "The first two trials . . . resulted in mistrials after the jurors had reported that they were deadlocked. After a third trial . . . the defendant was convicted of murder and was sentenced to a fifty year term of imprisonment. On the defendant's appeal from his conviction, we reversed the judgment of the trial court and remanded the case for a new trial, concluding that the trial court had violated the defendant's constitutional right to confrontation by precluding certain evidence showing motive and bias on the part of the state's chief witness, Janice Tourangeau. . . .

"Subsequently, the state initiated a fourth prosecution of the defendant on the same charge. The defendant moved to dismiss, asserting [inter alia] that . . . double jeopardy principles [barred] a fourth trial because of prosecutorial misconduct at the third trial . . . ." (Citation omitted.) Id., 684–85. In support of that motion, the defendant sought to introduce evidence establishing that the prosecutor did not adequately investigate information contained in police reports that conflicted with Tourangeau's testimony at trial and, therefore, may have suborned perjury. Id., 690–91. The trial court denied the defendant's motion, concluding, as a matter of law, that "the claim of prosecutorial misconduct could not be brought in a motion to dismiss . . . because the defendant had not alleged prosecutorial misconduct either in a motion for mistrial during the previous trial or on appeal from his conviction at that trial." Id., 685–86. We reversed the judgment of the trial court and remanded the case to that court to consider the merits of the defendant's motion to dismiss. Id., 700, 703. In conjunction with that remand, we

observed that, "[i]n order to have a fair opportunity to meet his difficult burden of proving that the prosecutor had engaged in misconduct with the intent to avoid an acquittal that was likely,[9] the defendant must be able to bring that alleged misconduct to the attention of the court." Id., 697. We further stated that, "[t]o the extent that misconduct allegedly has occurred off-the-record, a defendant must have an opportunity to make a record in some fashion." Id., 698.

In the present case, the defendant argues that our use of the word "must" in these latter statements translates into a requirement that trial courts conduct an evidentiary hearing in every case in which a defendant claims that incidents of prosecutorial misconduct may have occurred off-the-record. The defendant's reading of these statements in *Colton*, however, is misguided because it fails to consider the factual and procedural context in which they were made and disregards our subsequent holdings in *Brown* and *Nguyen*.

In *Colton*, the trial court declined to consider any factual allegations of prosecutorial misconduct because it concluded that the defendant's motion to dismiss on double jeopardy grounds was barred as a matter of law. See id., 685–86, 698. We simply meant to suggest that, on remand, the defendant was to be afforded an opportunity to develop a factual record of prosecutorial misconduct in support of his motion to dismiss, including any off-the-record conduct that was relevant to the court's inquiry. See id., 697–98, 700. It was not our

[9] Because the defendant in *Colton* raised his double jeopardy claim after the reversal of his conviction, rather than after the declaration of a mistrial, we applied the limited extension of the rule announced in *Oregon* v. *Kennedy*, supra, 456 U.S. 679, as articulated by the Second Circuit Court of Appeals in *United States* v. *Wallach*, 979 F.2d 912, 916 (2d Cir. 1992), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993), and *United States* v. *Pavloyianis*, 996 F.2d 1467, 1474 (2d Cir. 1993). See *State* v. *Colton*, supra, 234 Conn. 696, 700.

intention to issue a mandate to trial courts that they must conduct an evidentiary hearing in every case in which a defendant claims that the prosecutor might have committed some misdeed off-the-record, particularly when, as in the present case, the record alone provides an adequate basis for a court's factual finding. Nor did we hold that a court's denial of such a hearing automatically constitutes an abuse of discretion and a concomitant violation of a defendant's due process rights.

Moreover, the defendant's interpretation of *Colton* presents an irreconcilable conflict with *Brown* and *Nguyen*, in which we made clear that the trial court has broad discretion to determine whether it should conduct an evidentiary hearing even when constitutional rights are at stake. See *State* v. *Nguyen*, supra, 253 Conn. 654–55; *State* v. *Brown*, supra, 235 Conn. 523–24. In *Brown*, we noted that "[t]here may well be cases . . . in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit. In such cases, a defendant's constitutional rights may not be violated by the trial court's failure to hold an evidentiary hearing . . . ." *State* v. *Brown*, supra, 528; see also *State* v. *Nguyen*, supra, 660. We conclude that the present case is one of those cases.

The dissent, however, would hold that the trial court abused its discretion in denying the defendant an evidentiary hearing because "[t]he record in this case is not dispositive of whether the [prosecutor] engaged in the alleged prosecutorial misconduct." In so concluding, the dissent posits that the allegations embodied in Haselkamp's affidavit, coupled with the defendant's representation to the court that he needed an evidentiary hearing in order to determine "precisely which allegations [the prosecutor] had known about prior to

trial, when she had gained that knowledge, and what, if anything, she had done with those statements . . . were sufficient to trigger the defendant's right to an evidentiary hearing . . . ." The dissent also concludes that it was unreasonable for the trial court to draw inferences about the prosecutor's intent before it conducted an evidentiary hearing because there were disputed facts concerning her alleged misconduct that could be resolved only through a hearing. Indeed, the dissent goes so far as to suggest that we should afford no deference whatsoever to the trial court in this case because the record was inadequate as a matter of law to support the court's factual finding.

In response to these arguments, we first note that the dissent does not dispute our conclusion that the allegations in Haselkamp's affidavit would be insufficient to support a finding that the prosecutor had intended to provoke a mistrial even if the prosecutor had admitted that they were true. The dissent contends that an evidentiary hearing was necessary in this case simply because there was a dispute over whether the prosecutor committed misconduct that led to the mistrial. That question, however, is not the relevant inquiry in this case. Rather, the fact to be proved, and, thus, the only proper subject of an evidentiary hearing, is whether the prosecutor deliberately engaged in misconduct with the specific intent to goad the defendant into moving for a mistrial. *Oregon* v. *Kennedy*, supra, 456 U.S. 676. Because the defendant made no offer of proof that was sufficient to establish that an evidentiary hearing likely would produce evidence tending to prove that fact, we disagree with the dissent's conclusion that the trial court abused its discretion in failing to undertake one.

We also disagree with the dissent's suggestion that we should afford no deference to the trial court in this case because "the record, as a matter of law, was

inadequate to allow the court to decide the issue." We long have afforded great deference to a trial court's factual findings and its exercise of discretion due to the trial judge's superior opportunity to observe the proceedings. See, e.g., *State* v. *Nguyen,* supra, 253 Conn. 654–55; *State* v. *Brown,* supra, 235 Conn. 523–24. We see no reason to depart from that principle in this case. Moreover, despite the dissent's representation that it agrees with our conclusion that an evidentiary hearing is not required in every case in which the defendant alleges that the prosecutor has committed off-the-record misconduct, its reasoning would seem to support a contrary result. The dissent's statement that the record in the present case was inadequate "as a matter of law" suggests that an evidentiary hearing must be conducted in every case in which the defendant: (1) claims that the prosecutor might have committed some misconduct off the record that was related to the mistrial—whether it be a failure to turn over exculpatory evidence, the improper questioning of a witness, the failure to investigate discrepancies in the proffered testimony or other misconduct—and that would call into question the prosecutor's intent; and (2) requests an evidentiary hearing. That approach would strip the trial court of its discretion to deny an evidentiary hearing in the vast majority of cases of this nature. In our view, such a rule of law is not only unnecessary but also undesirable because it does not afford the trial judge flexibility to fashion its inquiry into alleged misconduct on the basis of the unique circumstances of each case.[10]

---

[10] The dissent also asserts that "the burden of proving that the alleged prosecutorial misconduct had been undertaken not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct by provoking the defendant into seeking a mistrial, is a heavy one." In making that statement, the dissent seems to suggest that the limited extension of the rule established in *Oregon* v. *Kennedy,* supra, 456 U.S. 679, that has been adopted by the Second Circuit Court of Appeals to address cases in which a defendant's conviction has been reversed on appeal on the basis of prosecutorial misconduct; see *United States* v. *Pavloyianis,* 996 F.2d 1467, 1474 (2d Cir. 1993);

Finally, we note that the federal courts also have concluded that an evidentiary hearing is not necessary when, as in the present case, the relevant facts concerning prosecutorial intent can be ascertained from the record. See, e.g., *United States* v. *Curry*, 328 F.3d 970, 974 (8th Cir. 2003) (upholding District Court's denial of motion for evidentiary hearing and noting that, because District Court "had heard the trial and was familiar with the objective facts and circumstances of the case, a hearing was not necessary"); *United States* v. *Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993) (upholding District Court's denial of defendant's request for evidentiary hearing to determine whether prosecutor engaged in misconduct with intent to avoid likely acquittal, as "[n]o rule of law requires a hearing [under the circumstances] of [the] case [when] the relevant facts [could] be ascertained from the record").[11]

*United States* v. *Wallach*, 979 F.2d 912, 916 (2d Cir. 1992), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993); has supplanted the test adopted by the United States Supreme Court in *Kennedy* for cases involving mistrials, namely, whether "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon* v. *Kennedy*, supra, 679. The United States Supreme Court never has so held.

[11] Notwithstanding our observation in footnote 10, we do not agree with the dissent that the teachings of the Second Circuit Court of Appeals in *United States* v. *Pavloyianis*, supra, 996 F.2d 1467, with respect to a defendant's right to an evidentiary hearing are irrelevant in the present case. The defendant in that case, Costas Pavloyianis, "was found guilty of conspiring to distribute heroin . . . . After his conviction the prosecutor revealed that during the course of the trial one of its key witnesses had committed perjury." Id., 1469. After the government consented to a new trial, the defendant moved to dismiss the heroin conspiracy charge on double jeopardy grounds and also requested an evidentiary hearing to investigate the alleged prosecutorial misconduct. Id. The District Court denied the motion to dismiss and the request for an evidentiary hearing, first noting "that despite the defendant's argument that the government withheld [the witness'] perjury because it anticipated an acquittal, there was no indication of such anticipation, and . . . there was ample evidence to convict, even if the jury had been aware of [the witness'] perjury . . . ." Id., 1471. The District Court also noted, without further explanation, that "an evidentiary hearing at this stage would serve no purpose." (Internal quotation marks omitted.) Id. The Second Circuit Court of Appeals affirmed the order of the District Court denying the

For the foregoing reasons, we conclude that the trial court did not abuse its discretion or violate the defendant's due process rights in failing to conduct an evidentiary hearing under the circumstances of this case.

## II

The defendant also challenges the trial court's factual finding that the prosecutor did not intend to provoke him into moving for a mistrial when she elicited inadmissible testimony from C. He claims that this erroneous finding led the court to conclude improperly that a retrial on the charges would not violate his right to be free from double jeopardy under the United States constitution. We disagree.

Before we analyze the merits of the defendant's claim, we articulate certain double jeopardy principles that are fundamental to federal constitutional jurisprudence. "The Double Jeopardy Clause of the Fifth Amendment[12] protects a criminal defendant from

motion to dismiss and request for a hearing; id., 1475; concluding that, even if it assumed "that the [prosecutor's] actions constituted deliberate misconduct, there [was] simply no evidence that [the] misconduct was perpetrated with the specific objective of avoiding an acquittal that the prosecutor viewed as likely. The evidence against [the defendant] was strong enough so that the government had every reason to anticipate a conviction . . . ." Id., 1474. The Court of Appeals also disagreed with the defendant's claim "that the district court was simply wrong as a matter of law in not permitting him to proceed with such a hearing." Id., 1475. In so holding, the court explained: "No rule of law requires a hearing in this sort of case [when] the relevant facts can be ascertained from the record. . . . The district court that presided over all the proceedings and that reviewed affidavits, which it ordered the government to submit, concluded that there was not the slightest indication or evidence that the trial prosecutor anticipated an acquittal." (Citation omitted; internal quotation marks omitted.) Id.

[12] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

repeated prosecutions for the same offense. . . . As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a valued right to have his trial completed by a particular tribunal." (Citation omitted; internal quotation marks omitted.) *Oregon* v. *Kennedy*, supra, 456 U.S. 671–72. As a general rule, however, the double jeopardy clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading the court to declare a mistrial. See id., 673; see also *United States* v. *Botello*, 991 F.2d 189, 192 (5th Cir. 1993) ("[a] motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error" [internal quotation marks omitted]), cert. denied, 510 U.S. 1074, 114 S. Ct. 886, 127 L. Ed. 2d 80 (1994). The rationale for this general rule is that "[a] defendant's motion for a mistrial constitutes a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." (Internal quotation marks omitted.) *Oregon* v. *Kennedy*, supra, 676, quoting *United States* v. *Scott*, 437 U.S. 82, 93, 98 S. Ct. 2187, 57 L. Ed. 2d 65 (1978). The United States Supreme Court has recognized, however, that "the defendant's valued right to complete his trial before the first jury would be a hollow shell if the inevitable motion for mistrial were held to prevent a later invocation of the bar of double jeopardy in all circumstances." *Oregon* v. *Kennedy*, supra, 673. The court therefore has established a narrow exception to the rule allowing retrial after a defendant's request for a mistrial. See id., 676, 679. In accordance with that exception, "a defendant may invoke the bar of double jeopardy in a second effort to try him . . . [when] the [government] conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Id., 679.

The court in *Kennedy* emphasized, however, that this exception has a very limited scope: "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on [a] defendant's motion . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . [It is] [o]nly [when] the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." (Citations omitted.) Id., 675–76. Thus, in the absence of such an intent, "a prosecutor's error in questioning a witness, improper remark in a closing statement, and even extensive misconduct do not prevent reprosecution." *United States v. Curry*, supra, 328 F.3d 972. Finally, the determination of whether a prosecutor acted with the intent to provoke a mistrial is a finding of fact to be made by the trial court. See *Oregon v. Kennedy*, supra, 456 U.S. 675; *State v. Butler*, supra, 262 Conn. 177.

With respect to our standard of review, we note that, "[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State v. Butler*, supra, 262 Conn. 177. "In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State v. Faraday*, 268 Conn. 174, 185, 842 A.2d 567 (2004).

The defendant does not claim that the record is devoid of any evidence that would support the court's

factual finding with respect to the prosecutor's intent. Rather, the defendant claims that the prosecutor was well aware of the court's order limiting her proof to the incidents of abuse specified in the bill of particulars, and, despite that knowledge, she continued to ask C numerous follow-up questions about acts of uncharged misconduct that allegedly had occurred at the motel. The defendant urges us to conclude that the trial court's finding regarding the prosecutor's intent was clearly erroneous because the only reasonable inference one could draw from the prosecutor's improper questioning, when viewed in light of the allegations in Haselkamp's affidavit, is that she intended to goad the defendant into moving for a mistrial. In so arguing, the defendant does little more than ask us to adopt his speculative inferences and substitute them for the contrary finding of the trial court. This we will not do.

"In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *State* v. *Nosik*, 245 Conn. 196, 205, 715 A.2d 673, cert. denied, 525 U.S. 1020, 119 S. Ct. 547, 142 L. Ed. 2d 455 (1998). Furthermore, we recognize that, "[i]n making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence." (Internal quotation marks omitted.) *State* v. *Hill*, 256 Conn. 412, 425, 773 A.2d 931 (2001). That is precisely what the trial court did in the present case. On the basis of its firsthand observations of the proceedings, the trial court reasonably found that the prosecutor had not intended to goad the defendant into moving for a mistrial when she elicited inadmissible testimony from C. There is nothing

in the record to suggest that this finding was clearly erroneous.

Even if we were to assume, arguendo, that the prosecutor deliberately pursued an improper line of questioning when she continued to ask C about the defendant's alleged, uncharged misconduct, such over-reaching would not be sufficient to bar further prosecution of the defendant under the United States constitution. See, e.g., *Oregon* v. *Kennedy*, supra, 456 U.S. 675–76; *United States* v. *Curry*, supra, 328 F.3d 972; *United States* v. *Neufeld*, 949 F. Sup. 555, 559 (S.D. Ohio 1996), aff'd mem., 149 F.3d 1185 (6th Cir.), cert. denied, 525 U.S. 1020, 119 S. Ct. 548, 142 L. Ed. 2d 456 (1998).[13] Moreover, our conclusion does not change even when we consider the allegations set forth in Haselkamp's affidavit, because nothing contained therein necessitates an inference that the prosecutor intended to provoke a mistrial. On the basis of our review of the evidence, including Haselkamp's affidavit and the prosecutor's representation to the court that she could not have foreseen that C would testify as she did concerning

---

[13] *Neufeld* is particularly illustrative. The prosecutor in *Neufeld* elicited testimony from a witness that violated a pretrial order that previously had been issued by the District Court. *United States* v. *Neufeld*, supra, 949 F. Sup. 557. Because that testimony was "so unfairly prejudicial" to the defendants, the court granted their motion for a mistrial. Id., 558. Thereafter, the defendants moved to dismiss the charges on the ground of double jeopardy, claiming "that the government's intentional elicitation of the prejudicial testimony . . . show[ed] its intention to goad the defendants into requesting a mistrial." Id., 558–59. Although the prosecutor acknowledged that he deliberately had elicited the testimony from the witness "with the intention of using it as a basis for the government's theory of the case"; id., 557; the District Court nonetheless concluded that such an admission did not support an inference that the prosecutor had intended to provoke the defendants into moving for a mistrial under the circumstances of that case. Id., 562. In so holding, the court stated: "The exception enunciated in *Kennedy* requires a showing of more than a deliberate act—there must be a showing that the prosecutor's deliberate conduct was intended to provoke the defendant into moving for a mistrial." (Internal quotation marks omitted.) Id., 559.

the uncharged misconduct, we are persuaded that the trial court's finding with respect to the prosecutor's intent was not clearly erroneous. We therefore conclude that the trial court properly determined that the defendant's retrial would not violate the double jeopardy guarantee embodied in the United States constitution.

## III

Finally, we turn to the defendant's state constitutional claim. The defendant maintains that the rule enunciated in *Oregon* v. *Kennedy*, supra, 456 U.S. 679, is not sufficiently protective of his double jeopardy rights and, therefore, that we should construe the constitution of Connecticut to impose a more liberal test. Specifically, the defendant urges us to adopt a standard pursuant to which retrial would be barred whenever a mistrial is declared due to "prosecutorial misconduct . . . [that] is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial . . . ." (Internal quotation marks omitted.) We reject that invitation.

We begin our analysis with the legal principles that guide our review of the defendant's state constitutional claim. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection . . . ." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). "When determining whether our state constitution affords . . . greater individual liberties than does its federal counterpart, we consider, to the extent applicable, six factors [the '*Geisler*' factors]: (1) the text of relevant constitutional provisions; (2) historical insights into the intent of our constitutional forebears; (3) related Connecticut precedents; (4) persuasive federal precedents; (5) persuasive precedents of other

state courts; and (6) contemporary understandings of applicable economic and sociological norms." *State* v. *Tuchman*, 242 Conn. 345, 360, 699 A.2d 952 (1997), cert. dismissed, 522 U.S. 1101, 118 S. Ct. 907, 139 L. Ed. 2d 922 (1998), citing *State* v. *Geisler*, supra, 684–86.

The constitution of Connecticut does not contain an express prohibition against double jeopardy. Instead, we repeatedly have held that the due process guarantees, presently encompassed in article first, § 8, of the Connecticut constitution, include protection against double jeopardy. See, e.g., *State* v. *Crawford*, 257 Conn. 769, 774, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002); *State* v. *Nixon*, 231 Conn. 545, 550, 651 A.2d 1264 (1995); *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).[14] We have observed, however, that "the absence of an explicit constitutional double jeopardy provision strongly suggests that the incorporated common-law double jeopardy protection mirrors, rather than exceeds, the federal constitutional protection." *State* v. *Tuchman*, supra, 242 Conn. 360. What is most damaging to the defendant's claim, however, is that a historical review reveals that the exclusion of a textual ban on double jeopardy from the constitution of Connecticut was not the result of oversight but,

---

[14] The cases to which we cite, among others, refer to the due process guarantees of article first, § 9, of the Connecticut constitution. We note that the due process clause originally was embodied in article first, § 9, of the constitution of Connecticut. See Conn. Const. (1818), art. I, § 9 ("[i]n all criminal prosecutions, the accused . . . shall not . . . be deprived of life, liberty or property, but by due course of law"). When the current state constitution was adopted in 1965, however, the due process clause was transferred to article first, § 8, which provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ." Conn. Const., art. I, § 8.

rather, the product of a conscious decision by our constitutional forebears. See generally 2 Proceedings of the Connecticut Constitutional Convention (1965) pp. 698–716. As we discuss in the overview that follows, the delegates of the 1965 constitution were concerned that the addition of such a clause might be perceived as a change in Connecticut law; see id., pp. 703, 704, 714–15; which historically afforded defendants far less protection against double jeopardy than the federal constitution.

The double jeopardy clause of the fifth amendment to the United States constitution was not made applicable to the states through the fourteenth amendment until 1969, when the United States Supreme Court decided *Benton* v. *Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The cornerstone of Connecticut's pre-1969 law was a statute enacted in 1886; Public Acts 1886, c. 15; that allowed the state to take an appeal from a criminal trial, with the permission of the trial court, even if the defendant had been acquitted. See General Statutes (1888 Rev.) tit. 19, c. 100, § 1637. The unique character of that statute and its interrelationship with Connecticut common law is illustrated by the landmark case of *State* v. *Lee*, 65 Conn. 265, 30 A. 1110 (1894).

In *Lee*, the defendant, J. Edward Lee, had been indicted and tried for murder, but was found not guilty by a jury. Id., 271. The state appealed pursuant to General Statutes (1888 Rev.) tit. 19, c. 100, § 1637, claiming that a new trial should have been ordered because the trial court had committed errors in its charge to the jury and in certain of its evidentiary rulings. Id. The defendant maintained that a retrial on the murder charge after he had been acquitted would violate our own common law because it would "twice put [him] in jeopardy" for the same offense. (Internal quotation marks omitted.) Id. We disagreed, reasoning that "[t]he

end is not reached, the cause is not finished, until both the facts and the law applicable to the facts are finally determined." Id., 272. Thus, under Connecticut common law, jeopardy for the defendant continued until a result was attained that was free from error, even if that required multiple trials. Such a doctrine stood in direct contrast to federal constitutional jurisprudence, as espoused by the United States Supreme Court in *Kepner* v. *United States*, 195 U.S. 100, 129, 132–33, 24 S. Ct. 797, 49 L. Ed. 114 (1904) (holding that double jeopardy clause of fifth amendment barred retrial of defendant after he had been acquitted and noting that vast majority of states adhered to that rule). Indeed, the court in *Kepner* recognized the "exceptional character" of our decision in *Lee* and observed that legal commentators have reported that "[the] case in its view of former jeopardy, stands out in bold relief against the commonly understood meaning of what constitutes once in jeopardy. . . .

"The law almost universally prevalent is that a verdict of acquittal in a criminal case is final and conclusive, and that there can be no new trial of a criminal prosecution after an acquittal in it." (Internal quotation marks omitted.) Id., 133. We reaffirmed our holding in *Lee* approximately four decades later in *State* v. *Palko*, 122 Conn. 529, 541–42, 191 A. 320 (concluding that there was no double jeopardy violation under Connecticut law when defendant was convicted, after retrial, of *first* degree murder and sentenced to death after state successfully had appealed his *second* degree murder conviction), aff'd, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937).

Connecticut's unique double jeopardy doctrine was at the forefront of the minds of those who drafted the revised constitution of Connecticut in 1965. During the constitutional convention, the delegates considered an amendment that would have added a specific double

jeopardy clause to our constitution. See generally 2 Proceedings of the Connecticut Constitutional Convention, supra, pp. 698–716. The delegates declined to adopt the amendment because they were concerned that it would be perceived as a change in the status quo.[15] See id., pp. 703, 704, 714–15. Specifically, the record of the proceedings reveals that the delegates sought to maintain then-existing law, even though they recognized that it afforded Connecticut citizens less protection than that provided by the United States constitution. See id., pp. 703–704, 715. Those efforts were thwarted, however, just four years later when the United States Supreme Court decided *Benton* v. *Maryland*, supra, 395 U.S. 784. In *Benton,* the court concluded that "the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment." Id., 794.

In light of the fact that our constitutional forebears intentionally sought to maintain a rule of law that was, undeniably, one of the least protective double jeopardy doctrines in the nation, it seems outlandish to conclude that they could have intended that our state constitution would afford defendants greater protection against double jeopardy than the federal constitution.[16] Despite this

---

[15] This sentiment is most apparent in the following remarks by former Chief Justice Patrick B. O'Sullivan: "In the event that this amendment [containing an express guarantee against double jeopardy] were enacted, some wise and capable lawyer might make the claim that we were changing our theory of double jeopardy, that the state no longer could appeal, and consequently you would be having another cloak around an already perfectly protected group of individuals charged with crime . . . ." 2 Proceedings of the Connecticut Constitutional Convention, supra, pp. 703–704. Similarly, James J. Kennelly stated: "I say that we should do nothing to cast [into] question or to cloud the present statutory availability of the state to take an appeal." Id., p. 715.

[16] Indeed, our historical analysis leads us to question the fundamental premise of the defendant's claim, namely, whether a guarantee against double jeopardy even exists in the state constitution. In other words, if our constitutional forebears rejected an express textual ban on double jeopardy in the revised constitution of Connecticut, then how could they have intended

354

conclusion, we nonetheless proceed to evaluate the remaining four *Geisler* factors.

Connecticut appellate courts never have held that the double jeopardy guarantees implied in the state constitution exceed those embodied in the federal constitution. In fact, both this court and the Appellate Court have stated the opposite. *State* v. *Tuchman*, supra, 242 Conn. 359–62 (in rejecting defendant's claim that we should construe state constitution to require more liberal standard for determining whether administrative sanctions constitute punishment for double jeopardy purposes, court concluded that none of *Geisler* factors supported such construction); *State* v. *Laws*, 37 Conn. App. 276, 292–95, 655 A.2d 1131 (concluding that application of *Geisler* factors did not support defendant's claim that court should construe state constitution to require rule that differed from federal constitutional rule announced in *Blockburger* v. *United States*, 284 U.S. 229, 304, 52 S. Ct. 180, 76 L. Ed. 306 [1932], as means to determine whether one crime is lesser included offense of another crime for double jeopardy purposes), cert. denied, 234 Conn. 907, 659 A.2d 1210 (1995); see, e.g., *State* v. *Butler*, supra, 262 Conn. 167 ("[t]he Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy" [internal quotation marks omitted]); *State* v. *Benjamin*, 86 Conn. App. 344, 348 n.5, 861 A.2d 524 (2004) ("our state constitution does not provide greater protection [against double jeopardy] than the federal constitution").

that such a right be implied in the due process clause? We note, however, that the state does not make this argument in response to the defendant's claim, but merely contends that the double jeopardy guarantee implied in the state constitution is coextensive with that of the fifth amendment to the United States constitution. Notwithstanding our question concerning the existence of a state constitutional guarantee against double jeopardy, we do not believe that it is appropriate to revisit that issue in this case because it has not been briefed by the parties.

We further note that the United States Supreme Court has never repudiated the narrow test adopted in *Oregon v. Kennedy,* supra, 456 U.S. 679, and it retains its vitality in the federal courts. E.g., *Rutherford v. Crosby,* 385 F.3d 1300, 1307–1308 (11th Cir. 2004); *United States v. McIntosh,* 380 F.3d 548, 557 (1st Cir. 2004); *United States v. Lewis,* 368 F.3d 1102, 1108–1109 (9th Cir. 2004), cert. denied, 543 U.S. 1053, 125 S. Ct. 901, 160 L. Ed. 2d 775 (2005); *United States v. Curry,* supra, 328 F.3d 972; *United States v. Wharton,* 320 F.3d 526, 531–32 (5th Cir.), cert. denied, 539 U.S. 916, 123 S. Ct. 2288, 156 L. Ed. 2d 132 (2003); *United States v. Gonzalez,* 248 F.3d 1201, 1203 (10th Cir. 2001); *United States v. Strickland,* 245 F.3d 368, 383–84 (4th Cir.), cert. denied, 534 U.S. 894, 122 S. Ct. 213, 151 L. Ed. 2d 152 (2001), and cert. denied, 534 U.S. 930, 122 S. Ct. 294, 151 L. Ed. 2d 217 (2001).[17] At least fourteen of our sister states,

---

[17] We do not agree with the defendant's assertion that the decision of the Second Circuit Court of Appeals in *United States v. Wallach,* 979 F.2d 912, 916 (2d Cir. 1992), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993), shows that the federal courts "have already begun to chip away at the [majority's] position in *Kennedy* . . . ." In *Wallach,* the court, recognizing that *Kennedy* addressed only those cases in which the defendant moves for a mistrial, wrestled with the issue of whether the Supreme Court would extend the *Kennedy* doctrine to cases involving convictions that are reversed on appeal because of trial error caused by prosecutorial misconduct. Id., 915. The court stated that, "[i]f any extension of *Kennedy* . . . is warranted, it would be a bar to retrial only [when] the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct." Id., 916. The court reasoned that, "if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict." Id. According to the court, "[t]here is no justification for that distinction." Id. Thus, *Wallach* did not diminish the vitality of the *Kennedy* rule in cases involving mistrials; *Wallach* merely applied the doctrine to circumstances it perceived to be logically similar. See id. The Second Circuit reaffirmed the extension of the *Kennedy* rule, as announced in *Wallach,* one year later when it decided *United States v. Pavloyianis,* supra, 996 F.2d 1473–74.

however, have questioned whether the *Kennedy* rule should serve as the governing standard under the double jeopardy clauses of their respective state constitutions or whether a broader, more expansive test is desirable. The state courts are equally divided on that question.

The high courts of seven states have embraced the *Kennedy* rule as the appropriate standard under their respective state constitutions, presumably because of the rule's clarity and ease in application. See *State* v. *Bell*, 322 N.W.2d 93, 94 (Iowa 1982), cert. denied, 459 U.S. 1210, 103 S. Ct. 1204, 75 L. Ed. 2d 445 (1983); *State* v. *Williams*, 268 Kan. 1, 6, 988 P.2d 722 (1999); *Stamps* v. *Commonwealth*, 648 S.W.2d 868, 869 (Ky. 1983); *State* v. *Chapman*, 496 A.2d 297, 300 (Me. 1985); *State* v. *Duhamel*, 128 N.H. 199, 202, 512 A.2d 420 (1986); *State* v. *White*, 322 N.C. 506, 511, 369 S.E.2d 813 (1988); *State* v. *Diaz*, 521 A.2d 129, 133 (R.I. 1987).

The high courts in another seven states have adopted competing state standards that bar retrial in a broader array of circumstances involving prosecutorial misconduct. See *Pool* v. *Superior Court*, 139 Ariz. 98, 108–109, 677 P.2d 261 (1984); *People* v. *Batts*, 30 Cal. 4th 660, 695, 68 P.3d 357, 134 Cal. Rptr. 2d 67 (2003), cert. denied sub nom. *McCrea* v. *California*, 540 U.S. 1185, 124 S. Ct. 1409, 158 L. Ed. 2d 91 (2004), and cert. denied, 540 U.S. 1185, 124 S. Ct. 1432, 158 L. Ed. 2d 91 (2004); *State* v. *Rogan*, 91 Haw. 405, 423, 984 P.2d 1231 (1999); *State* v. *Breit*, 122 N.M. 655, 666, 930 P.2d 792 (1996); *State* v. *Kennedy*, 295 Or. 260, 276, 666 P.2d 1316 (1983); *Commonwealth* v. *Smith*, 532 Pa. 177, 186, 615 A.2d 321 (1992); *Bauder* v. *State*, 921 S.W.2d 696, 698–99 (Tex. Crim. App. 1996). These courts have concluded that the *Kennedy* test is insufficient to protect a defendant's right to have his trial completed in his chosen tribunal primarily for the two principal reasons advanced by United States Supreme Court Justice Ste-

vens in his concurring opinion in *Kennedy*. See, e.g.,
*Pool* v. *Superior Court*, supra, 108; *State* v. *Rogan*,
supra, 422–23; *State* v. *Kennedy*, supra, 274–76. First,
it is extremely difficult to prove that a prosecutor
engaged in misconduct with the subjective intent "to
provoke a mistrial instead of an attempt simply to preju-
dice the defendant." *Oregon* v. *Kennedy*, supra, 456
U.S. 688 (Stevens, J., concurring). Second, the standard
espoused by the majority in *Kennedy* does not cover
other situations in which a prosecutor may engage in
harassment or overreaching that is so egregious that
"the defendant's double jeopardy interests outweigh
society's interest in obtaining a judgment on the merits
. . . ."[18] Id., 689 (Stevens, J., concurring). We note, how-
ever, that each of the states that has adopted an alterna-
tive standard has reached that result through the
construction of a specific double jeopardy provision in
its state constitution. See *Pool* v. *Superior Court*, supra,
108; *People* v. *Batts*, supra, 685; *State* v. *Rogan*, supra,
423; *State* v. *Breit*, supra, 666; *State* v. *Kennedy*, supra,
276; *Commonwealth* v. *Smith*, supra, 186; *Bauder* v.
*State*, supra, 698. Because the constitution of Connecti-
cut does not contain such a clause, we find the prece-
dent from our sister states lacking in persuasive force.
Notwithstanding that observation, we present a brief

---

[18] Justice Stevens cited two examples in support of this proposition: "[A]
prosecutor may be interested in putting [a] defendant through the embar-
rassment, expense, and ordeal of criminal proceedings even if he cannot
obtain a conviction. In such a case, with the purpose of harassing the
defendant the prosecutor may commit repeated prejudicial errors and be
indifferent between a mistrial or mistrials and an unsustainable conviction
or convictions. Another example is when the prosecutor seeks to inject
enough unfair prejudice into the trial to ensure a conviction but not so
much as to cause a reversal of that conviction. This kind of overreaching
would not be covered by the [majority's] standard because, by hypothesis,
the prosecutor's intent is to obtain a conviction, not to provoke a mistrial.
Yet the defendant's choice—to continue the tainted proceeding or to abort
it and begin anew—can be just as 'hollow' in this situation as when the
prosecutor intends to provoke a mistrial." *Oregon* v. *Kennedy*, supra, 456
U.S. 689 (Stevens, J., concurring).

overview of the models that have been adopted by those states to rectify the aforementioned deficiencies in the *Kennedy* rule as perceived by Justice Stevens.

Pennsylvania and Hawaii have endorsed tests similar to that advocated by the defendant in this case. In those states, retrial is barred not only when prosecutorial misconduct is intended to provoke a defendant into moving for a mistrial but also when a prosecutor's conduct is "intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial"; *Commonwealth* v. *Smith*, supra, 532 Pa. 186; or is "so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial . . . ." *State* v. *Rogan*, supra, 91 Haw. 423.

Arizona, New Mexico, Oregon and Texas have adopted a standard of wilful disregard. Under the Texas formulation of that test, "a successive prosecution is jeopardy barred after [the] declaration of a mistrial at the defendant's request, not only when the objectionable conduct of the prosecutor was intended to induce a motion for [a] mistrial, but also when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request." *Bauder* v. *State*, supra, 921 S.W.2d 699. The standards embraced by Arizona, New Mexico and Oregon are similar. See *Pool* v. *Superior Court*, supra, 139 Ariz. 108–109; *State* v. *Breit*, supra, 122 N.M. 666; *State* v. *Kennedy*, supra, 295 Or. 276.

Finally, the standard formulated by the California Supreme Court draws on concepts embodied in *United States* v. *Wallach*, 979 F.2d 912, 916 (2d Cir. 1992), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993). See *People* v. *Batts*, supra, 30 Cal. 4th 692–95; see also footnote 17 of this opinion. Under the California test, retrial is barred "following the grant of a defen-

dant's mistrial motion (1) when the prosecut[or] intentionally commits misconduct for the purpose of triggering a mistrial, and also (2) when the prosecut[or], believing in view of events that unfold during an ongoing trial that the defendant is likely to secure an acquittal at that trial in the absence of misconduct, intentionally and knowingly commits misconduct in order to thwart such an acquittal—and a court, reviewing the circumstances as of the time of the misconduct, determines that from an objective perspective, the prosecutor's misconduct in fact deprived the defendant of a reasonable prospect of an acquittal." *People* v. *Batts*, supra, 695.

We believe that the competing tests adopted by the aforementioned states, with the possible exception of California, lack the requisite clarity to achieve an optimal balance between the defendant's double jeopardy rights and society's interest in enforcing its criminal laws. That observation particularly holds true with respect to the tests adopted by Pennsylvania and Hawaii, which are consistent with the standard urged by the defendant in this case. We agree with the California Supreme Court's critique of that model in *Batts*: "These standards appear to blur inappropriately the line between (i) the 'normal' species of prejudicial prosecutorial misconduct that violates a defendant's due process right to a fair trial and hence warrants the granting of a mistrial or the reversal of any conviction and a retrial of the offense, and (ii) the exceptional form of prosecutorial misconduct that warrants not only a mistrial or reversal of any resulting conviction, but also dismissal of the charges and a prohibition of any reprosecution of the defendant for the offense." Id., 690. That criticism closely parallels the concerns expressed by the United States Supreme Court in *Kennedy* that led it to adopt the narrow "intent to provoke mistrial" test. In *Kennedy*, the court stated that broader tests "offer

virtually no standards for their application." Id., 674. "By contrast, a [rule] that examines the intent of the prosecutor . . . is a manageable standard to apply." Id., 675.

We also are mindful of the court's observation in *Kennedy* that a trial judge, "[k]nowing that the granting of the defendant's motion for mistrial would all but inevitably bring with it an attempt to bar a second trial on grounds of double jeopardy . . . might well be more loath to grant a defendant's motion for mistrial." Id., 676. We further note that, even if judges were inclined to dismiss the charges on the ground of double jeopardy in those jurisdictions that have adopted broader tests, society's interest in enforcing its criminal laws would be compromised in those cases in which the prosecutorial misconduct was not sufficiently egregious to implicate truly the defendant's double jeopardy rights. See id., 672. For these reasons, we believe that the *Kennedy* rule best balances the values inherent in the guarantee against double jeopardy and the policy interests that underlie the final *Geisler* factor.

In sum, five of the six *Geisler* factors strongly counsel against our adoption of a state constitutional standard that differs from the *Kennedy* rule. Only one factor—the precedent of sister states—even remotely supports the defendant's claim. In our view, however, that factor does not militate in favor of a broader standard because the states that have adopted competing standards have done so on the basis of their construction of specific double jeopardy provisions embodied in their respective state constitutions. Accordingly, we conclude that the standard articulated by the United States Supreme Court in *Oregon* v. *Kennedy*, supra, 456 U.S. 679, also applies under the constitution of Connecticut for purposes of determining whether the prohibition against double jeopardy implied therein bars a defendant's reprosecution following a mistrial that was the result

of prosecutorial misconduct. The defendant's state constitutional claim therefore is foreclosed by our conclusion in part II of this opinion.

The denial of the defendant's motion to dismiss is affirmed.

In this opinion NORCOTT and VERTEFEUILLE, Js., concurred.

KATZ, J., with whom BORDEN, J., joins, concurring and dissenting. I agree with the majority that the abuse of discretion standard governs our review of the claim by the defendant, Michael J.; see footnote 1 of the majority opinion; that the trial court improperly failed to conduct an evidentiary hearing on the issue of whether the assistant state's attorney who tried the case intended to provoke a mistrial. I disagree, however, with the majority's determination in part I of its opinion that the trial court's failure to hold an evidentiary hearing did not meet this standard. Although there may well be cases wherein the trial court's determination as to an allegation of misconduct rightfully will be reached " 'solely on the basis of the allegations before it' "; *State* v. *Nguyen,* 253 Conn. 639, 656, 756 A.2d 833 (2000); this is not such a case. Accordingly, I conclude that the trial court should have conducted an evidentiary hearing before deciding whether to grant the defendant's motion to dismiss.[1]

The record reflects the following procedural history. During direct examination, in addition to the complainant's testimony pertaining to the two incidents specified

---

[1] Because I conclude herein that the failure to hold an evidentiary hearing in the present case was an abuse of discretion, I do not reach the issue, addressed in part II of the majority opinion, of whether the assistant state's attorney intentionally provoked the defendant to move for a mistrial. I do, however, agree with the majority's discussion of the doctrine of double jeopardy in part III of its opinion.

in the state's bill of particulars, she also testified regarding sexual conduct with the defendant and physical beatings inflicted by him. Specifically, the complainant testified that she was fearful of the defendant because she had been told by others that he previously had beaten her and her brothers. Also, she testified that, after performing cunnilingus on her, the defendant had laid on top of her, put his penis on top of her stomach, moving it back and forth, had told her to lay on her stomach, at which point he moved his penis between her stomach and the bed, and finally that he had told her to get on her knees, at which point he put his penis on her buttocks. This testimony was different than information that had been disclosed by the state prior to trial,[2] and included uncharged misconduct evidence that had not been disclosed to the defendant. The testimony also differed from information ordered disclosed to both parties by the trial court upon the defendant's request, specifically, reports prepared by the department of children and families (department) indicating that there had been no prior physical abuse in the family.

As a consequence, the defendant made a motion for a mistrial, reminding the court that it had granted the defendant's motion in limine confining the state to the specific allegations in the bill of particulars. Additionally, the defendant pointed out that there were material inconsistencies between what the complainant had stated before trial and her in-court testimony regarding the incidents that were included in the bill of particulars, and that the state's failure to disclose this exculpatory material was prejudicial. The assistant state's

---

[2] Prior to trial, the defendant learned from a report prepared by the department of children and families that the complainant had alleged that, at times other than those noted in the bill of particulars, the defendant had sexually abused her, including one incident of penetration. The defendant filed a motion in limine to preclude such evidence, which the trial court granted.

attorney admitted that she was aware of some of the changes in the complainant's story, but contended that these changes were not exculpatory, but, rather, were "fodder for her cross-examination." The assistant state's attorney denied any prior knowledge of the alleged beatings, but acknowledged that the complainant had informed her that the defendant was violent. Because the complainant had testified regarding other acts of misconduct that were not alleged in the bill of particulars and that did not provide the factual basis for those charges, and because this evidence was highly prejudicial, the trial court granted the defendant's motion for a mistrial. When granting the motion, the court commented that there was nothing "to suggest that the state knew the complainant would so testify as to these additional acts of misconduct."

Thereafter, the defendant filed a motion to dismiss the case on double jeopardy grounds and, in furtherance of that motion, he sought an evidentiary hearing in order to determine: (1) whether, prior to trial, the assistant state's attorney knew about the totality of the complainant's allegations that she had elicited during the complainant's direct testimony; (2) when that information, if any, had been disclosed to the assistant state's attorney; (3) and what she had done with any such information. The defendant argued that, because the inquiry at issue, as evidenced by his motion, involved conduct that did not occur in the courtroom and otherwise could not be known from the record, an evidentiary hearing was required. Specifically, the defendant asserted that, "the critical point here is all of what I would be intending to elicit happened outside the presence of the court off-the-record either in terms of investigations, in terms of interviews, or in terms of discussions between the party, and I can't envision another way to make an evidentiary record for the court to consider this claim without having an opportunity to do that." He further

indicated that the hearing could be concluded within one day.

The state argued in response that it had obtained no benefit from the mistrial and that the trial court's determination, when it granted the mistrial, that the state had not intentionally withheld information, was dispositive. In response to the latter contention, the defendant asserted that the issue before the court in his motion for a mistrial pertained to the fairness of the proceedings, a matter that could be determined based on the record, not the state's intent. By contrast, the defendant's motion to dismiss regarding activity that had occurred outside the presence of the court required an evidentiary hearing to create a factual record upon which the court could make its ultimate determination. The trial court nevertheless denied the defendant's request for the hearing, reiterating the conclusion it had made when granting the defendant's motion for a mistrial that, based on its observations and the fact that the defendant had not objected during the complainant's testimony, there was nothing to suggest that the state knew that the complainant would testify to these additional acts of misconduct. Accordingly, the court determined that no evidentiary hearing was necessary.

Thereafter, the defendant asked the trial court to reconsider its decision denying his request for an evidentiary hearing and filed a motion asking that the court include as a part of the record an affidavit from defense counsel stating, inter alia, that: (1) the assistant state's attorney had disclosed to defense counsel that it knew about, but failed to disclose, some of the complainant's inadmissible testimony; (2) prior to the argument on the motion in limine, the assistant state's attorney had expressed to defense counsel that the defendant likely would prevail at trial; and (3) the trial court had ordered disclosed to the parties redacted copies of certain

reports by the department that indicated other accusations of abuse by the defendant, including an act of penetration, and that the complainant's mother was going to relay some of that information to the assistant state's attorney. The defendant contended that it was critical to his motion to dismiss to be able to ascertain exactly what the state knew and when it knew it, and that an evidentiary hearing was therefore necessary. The trial court denied the motion on the basis of its earlier finding that the state had not intended to provoke a mistrial. The court refused to take the affidavit into account, but allowed it to be made part of the record.

The majority recognizes that the trial court should have considered the affidavit. The majority nonetheless concludes, on the basis of this record, including the affidavit, that the trial court's failure to hold an evidentiary hearing was not an abuse of discretion. Put another way, it concludes that the trial court properly confined itself to the record to conclude that the state had not intended to provoke a mistrial when it elicited evidence of the defendant's uncharged misconduct. I disagree.

The record in this case is not dispositive of whether the assistant state's attorney engaged in the alleged prosecutorial misconduct. In his attempt to carry his burden to prove a double jeopardy violation on the basis of prosecutorial misconduct, the defendant argued that the assistant state's attorney had made statements outside the courtroom that bore directly on the issues of whether the state had prior knowledge of the incidents about which the complainant improperly testified and whether the assistant state's attorney intentionally may have elicited the testimony. To summarize, in attempting to secure an evidentiary hearing, the defendant offered an affidavit to establish that, prior to the motion in limine, the assistant state's attorney had expressed her belief that the defendant was likely to prevail, and that the assistant state's attorney knew of

some of the complainant's allegations to which she improperly testified despite the court's ruling on the motion in limine.[3] In addition, the record reflects that the assistant state's attorney admitted that she knew about some of this testimony, she asked open-ended questions to the complainant, and she made no effort to rein in the complainant once her testimony dealt with inadmissible matters. The defendant, therefore, sought to elicit from the principal source, namely, the assistant state's attorney, precisely which allegations she had known about prior to trial, when she had gained that knowledge, and what, if anything, she had done with those statements. All of these facts and inquiries, none of which could have been before the court as a basis for its denial of the defendant's motion to dismiss because they took place off-the-record, were sufficient to trigger the defendant's right to an evidentiary hearing so that he could meet his burden of establishing that the state had intentionally sought to gain a mistrial.

In *State* v. *Colton*, 234 Conn. 683, 698, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996), we stated: "To the extent that misconduct allegedly has occurred off-the-record, a defendant must have an opportunity to make a record in some fashion." I agree with the majority that the right to an evidentiary hearing is not automatically triggered simply because material that occurred off-the-record is offered. Nonetheless, our statement in *Colton* is consistent with the notion that a good faith offer by the defendant of such material must be taken seriously, and there must be persuasive reasons to affirm a court's ruling

---

[3] The fact that the assistant state's attorney asserted that she considered these allegations to be part of the cunnilingus episode does not mean that, as the majority implies, the trial court necessarily would have concluded *after* an evidentiary hearing that her belief was genuine. Indeed, the assistant state's attorney's assertion was made and was credited by the court before defense counsel offered her affidavit that contained sworn statements that undermined that assertion.

denying such a hearing. No such reasons appear in the present case. To the contrary, the defendant's offer and requests provided a reasonable basis for such a hearing.

In deciding that the trial court did not abuse its discretion, the majority relies essentially on four factors. First, the majority relies on the trial court's opportunity to observe the proceedings, including in particular the manner in which the assistant state's attorney posed questions to the complainant and the complainant's demeanor and emotional state in response. Second, the majority points to the representations of the assistant state's attorney that she had no prior knowledge of the uncharged misconduct and concludes that "the trial court was entitled to credit the prosecutor's assertions . . . ." Third, the majority concludes that the affidavit by defense counsel did not support an inference of intentional misconduct. Finally, harkening back to its first ground for support, the majority concludes that further inquiry into the assistant state's attorney's "off-the-record conduct would do no more than 'impugn [her] veracity . . . and impose a staggering burden of time and effort on our already overburdened court system.' "

I agree that, although the assistant state's attorney was not under oath, and therefore her representations to the trial court did not comprise testimonial evidence; see *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 152–53, 496 A.2d 476 (1985); as an attorney and officer of the court, she was obligated to make truthful representations. Rules of Professional Conduct 3.3; see *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 8 n.5, 826 A.2d 1088 (2003). I do not agree, however, that her representations are dispositive of the issue.

There was no evidence that, after the trial court had granted the motion in limine to preclude any testimony not directly related to the four counts in the bill of

particulars, the assistant state's attorney properly prepared the complainant so that she would not testify regarding the uncharged misconduct. Nor does the testimony reflect any attempt by the assistant state's attorney to restrict or to control the complainant when she began to testify in violation of the court's preclusion order.

The record before the trial court, in conjunction with the affidavit, raised questions as to whether the assistant state's attorney was not being completely candid or whether she may have either intentionally or unintentionally failed to prepare the complainant adequately in light of the motion in limine. I agree that, ultimately, the trial court *could* have made the following inferences favorable to the state: (1) the assistant state's attorney was not being disingenuous and simply did not understand that inconsistent statements can indeed be exculpatory; see *State* v. *McPhail*, 213 Conn. 161, 165, 567 A.2d 812 (1989) (exculpatory evidence consisted of two written statements by state's witness that were inconsistent with her testimony at probable cause hearing and statements made by two other rooming house residents implicating another person); (2) the assistant state's attorney was ignorant of what boundaries should have been imposed on the complainant before she took the stand; (3) despite the fact that additional charges could have been brought against the defendant for the uncharged misconduct, the assistant state's attorney did not understand that this misconduct evidence fell within the parameters of the motion in limine; and (4) on the basis of a department report documenting allegations of other sexual abuse of the complainant by the defendant that "the complainant's mother was going to relay . . . to the [assistant state's attorney]," the assistant state's attorney thought that certain incidents alleged in the report were the allegations constituting the uncharged misconduct evidence that had been the

subject of the trial court's order, not the incident about which the complainant testified that gave rise to the mistrial.

The inferences favoring the state are all ones that the trial court properly could have drawn *after* the defendant had had the opportunity to inquire further. Instead, the court relied on a critical finding it had made at a time when the issue of intent was irrelevant and when the defendant would not have been prepared to present evidence as to that issue—in response to the motion for mistrial, a matter that pertained solely to the fairness of the proceedings and that properly could be determined based solely on the record. Indeed, the trial court made no effort to elicit any information from the state's attorney to determine whether an adverse inference as to her intent was warranted.[4] Therefore, I conclude that the record was inadequate to make a proper determination on the defendant's motion to dismiss and, accordingly, that the defendant should have been afforded the opportunity to have an evidentiary

---

[4] Notably, in *United States* v. *Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993), a case cited by the majority, the United States District Court for the Southern District of New York had obtained additional information from the state before making the critical determination as to the prosecutor's intent in purposely concealing information that was contrary to a witness' trial testimony. See id. (concluding that determination that defendant was not entitled to evidentiary hearing to determine prosecutor's intent was not improper, noting that District Court had reviewed affidavits by prosecutor that court had ordered state to submit). Moreover, in *United States* v. *Neufeld*, 949 F. Sup. 555, 557–58, 560-62 (S.D. Ohio 1996), aff'd, 149 F.3d 1185 (6th Cir.), cert. denied, 525 U.S. 1020, 119 S. Ct. 548, 142 L. Ed. 2d 456 (1998), also cited by the majority, the written decision by the United States District Court for the Southern District of Ohio evidences the careful reflection of the court on the issue of intent, separate and apart from its determination that the prosecutor's misconduct warranted a mistrial, based on an extensive colloquy as to that issue. Indeed, in *Neufeld*, the prosecutor admitted that he intentionally had elicited the improper, prejudicial testimony, the defendant did not claim that there was other evidence that bore on proving intent to goad a mistrial and thus the trial court properly could draw the adverse inference on the basis of the record before it. Id., 558–59.

hearing in order to demonstrate that it would be unreasonable to draw automatically those inferences favorable to the state.

The majority relies on *State* v. *Nguyen,* supra, 253 Conn. 639. In my view, that reliance is misplaced. In *Nguyen,* we relied on two factors to determine that the trial court had not abused its discretion by failing to conduct an evidentiary hearing before finding that a sequestration order had been violated and disallowing certain testimony. Id., 656–57. First, in response to the trial court's preliminary inquiry, defense counsel had acknowledged the essential facts that gave rise to the state's allegations of a sequestration order violation. Id. In fact, as we noted, "defense counsel's ultimate characterization of events was not necessarily inconsistent with the prosecutor's assertions. . . . Rather, defense counsel's own representations corroborated that a conversation in fact had taken place between himself and the defendant's wife while [the witness] was present, and that the exchange had related, in some respect, to the testimony previously given by the defendant's wife. In light of this corroboration, the prosecutor's allegations stood effectively uncontested." (Citation omitted.) Id., 659. As a consequence, defense counsel's representations provided adequate factual support for the trial court's determination that the discussion at issue undermined the purpose of the sequestration order. Id. Additionally, we considered the fact that, despite having had ample time to request an evidentiary hearing, the defendant failed to make such a request. Id., 660. This failure suggested that the defendant had been persuaded that the trial court's less extensive inquiry had been sufficient and strongly militated against a finding that the failure to conduct an evidentiary hearing was an abuse of discretion. Id. In the present case, the record is not essentially undisputed, and the defendant in this case twice sought an eviden-

tiary hearing and filed an affidavit in support of his request.

Similarly, the majority's reliance on *United States* v. *Pavloyianis*, 996 F.2d 1467 (2d Cir. 1993), is unavailing. In that case, the Second Circuit Court of Appeals affirmed the decision by the United States District Court for the Southern District of New York denying the defendant's motion to dismiss a subsequent prosecution on double jeopardy grounds. Id., 1475. The District Court had determined that an evidentiary hearing would serve no purpose because, in light of the *strong evidence of the defendant's guilt*, any misconduct was not deliberately engaged in to avoid the possibility of a likely acquittal. Id., 1474–75. The Court of Appeals affirmed, concluding that "[n]o rule of law requires a hearing in this sort of case where the relevant facts can be ascertained from the record." Id., 1475.

I reiterate that I agree with the majority that a hearing is not required in every case, and that this court's statement in *State* v. *Colton*, supra, 234 Conn. 698, that "[t]o the extent that misconduct allegedly has occurred off-the-record, a defendant must have an opportunity to make a record in some fashion," does not dictate otherwise. When, however, the record is not undisputed, some of the evidence that the defendant would require to demonstrate that the assistant state's attorney had engaged in misconduct with the intent to avoid an acquittal was not part of the record, and the evidence in the case distills to a credibility contest between the defendant and the complainant, the defendant should be given the opportunity to meet his difficult burden. As we have recognized, the burden of proving that the alleged prosecutorial misconduct had been undertaken not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct by provoking the defendant into seeking a mistrial, is a

heavy one. When there is " 'not the slightest indication or evidence that the trial prosecutor anticipated an acquittal' "; *United States* v. *Pavloyianis,* supra, 996 F.2d 1475; or "[a]ll parties have agreed that the present record suffices for this determination, and that no further testimony or other evidence is needed"; *United States* v. *Mitchell,* 572 F. Sup. 709, 715 (N.D. Cal. 1983); the need for an evidentiary hearing is significantly reduced, if not eliminated entirely. Those are not the circumstances of the present case.

I recognize that, generally, a finding of fact—that the assistant state's attorney did not have the intention to "goad" the defendant into moving for a mistrial—which is necessary to trigger a double jeopardy claim, warrants deference. See *Sumner* v. *Mata,* 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981). This principle is not controlling in the present case, however, absent the evidentiary hearing at which the defendant could call defense counsel, the assistant state's attorney and the complainant to testify. The present case is one in which the record, as a matter of law,[5] was inadequate to allow the court to decide the issue.[6]

---

[5] The majority misunderstands this conclusion. "Judicial discretion is always a legal discretion, exercised according to the recognized principles of equity. . . . The action of the trial court is not to be disturbed unless it abused its legal discretion, and [i]n determining this the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . The trial court's discretion imports something more than leeway in decision making and should be exercised in conformity with the spirit of the law and should not impede or defeat the ends of substantial justice." (Citation omitted; internal quotation marks omitted.) *Eldridge* v. *Eldridge,* 244 Conn. 523, 534–35, 710 A.2d 757 (1998). Therefore, when I state that the trial court as a matter of law abused its discretion when it refused to grant the defendant an evidentiary hearing on the issue of whether the assistant state's attorney had intended to provoke a mistrial, it is because I conclude that the court reasonably could not conclude as it did.

[6] I note that, even when the record reveals deliberate indefensible conduct throughout a trial that all but compels the conclusion that the state intended

Finally, I disagree with the majority's reasoning that further inquiry into the assistant state's attorney's "off-the-record conduct would do no more than 'impugn [her] veracity . . . and impose a staggering burden of time and effort on our already overburdened court system.' " First, the hearing would have been limited. The defendant represented: "The evidentiary [hearing] that we're talking about in this case could certainly be done within a day. I don't even envision that it would last the entire day." Given the limited scope of the inquiry, I have no reason to doubt that representation. Second, and of even greater importance, is that the entire purpose of the defendant's burden to establish an intentionality on the part of the state in securing a mistrial is to impugn the integrity and veracity of the state in that particular instance. That is why the burden is so heavy and also why the defendant, when he makes a good faith offer to provide off-the-record material that reasonably could support that burden, must be given the opportunity to do so by an evidentiary hearing. Furthermore, the fact that such a hearing will "burden" our judicial system is no reason to deny it. One of the fundamental purposes of our judicial system is to shoulder precisely the burden of deciding, by an evidentiary hearing, whether a person's constitutional rights have been violated when that person properly has made a record justifying such a hearing. It simply is impermissible for the defendant's right to a hearing to be outweighed by the system's interest in judicial economy.

Accordingly, I respectfully dissent.

to provoke a mistrial, other courts have determined that the state "should have an opportunity to present any evidence [it] may have that the prosecutor did not, as a matter of fact, intend to provoke [a defendant's] mistrial motions." *Petrucelli* v. *Smith*, 544 F. Sup. 627, 639 (W.D.N.Y. 1982); id. ("Accordingly, if [the prosecutor] wishes to offer such evidence, he is directed to notify the court of his intent within twenty days of the entry of this order. A prompt evidentiary hearing on this issue will then be scheduled. If no hearing request is made, my finding as to the prosecutor's intent will be final.").